The Honorable, the judges of the United States Court of Appeals for the Eighth Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the Eighth Circuit is now in session. All persons having business before this honorable court may now draw near and they will be heard. God save the United States and this honorable court. All right. Well, good morning, everybody. I think we're ready to proceed. And I think we will dispense with announcing the calendar for this morning since everyone is checked in and ready to go. And let's just proceed with our first case. Good morning. May it please the court. And I'm assuming that I can be heard. OK, thank you. I think you're loud and I think you're loud and clear so far. We may proceed, Mr. Meyer. Very good. Mark Meyer appearing for appellant Chad Mink. This is an appeal from a case from the southern district of Iowa. Mr. Mink was charged with a variety of different offenses. Fifteen counts, convicted of all 15. Sentenced to service 600 months in prison, 50 years. During prior to the trial commencing, he moved to sever some of the counts which was denied. The failure to sever counts 1, 2, and 3 from the remaining counts is one of the issues on appeal. He also, Mr. Mink in the trial court, challenged the sufficiency of the evidence regarding counts 14 and 15. Those were counts relating to tampering with the witness or obstruction of official proceedings. He received sentences of 240 months for those two counts. Another issue on appeal. And he also challenged in district court the sufficiency of the evidence for count 6, which pertained to a claim that he used a means of identification of another in connection with another felony offense. He received a 60-month sentence for that. The major components of his sentence were a 360-month sentence for count 8. He was charged with a felony offense which was possession of a destructive device in furtherance of a crime of violence. Now, my understanding that the government has conceded that the underlying offense is not a crime of violence and that that sentence should be set aside. And so I'm prepared to defend the notion that that sentence should be set aside, but I won't take up our argument time if that's not, if the court doesn't want me to address that, if the court is prepared to accept the government's concession. Well, Mr. Meyer, I would just use your time as you see fit, and we're here to hear your arguments and you just proceed in any order that you would like. All right. Thank you. Counsel. This is a judge. Are you asking us to reverse the sentence or vacate the conviction? I'm counting. Well, it would be both. I think that the conviction would have to be vacated because the underlying offense is not a crime of violence. Go with it. As I understood the government's position, they seem to agree that the conviction should be vacated and that it should be remanded. They also indicate that all of the sentences formed a sentencing package and that the sentencing package should be revisited by the sentencing judge when we send that back. And I didn't see any place where you disagreed with that. Is that your understanding? Yes, it is my understanding, Judge. Okay. All right. I would like to ask just a question about the failure to sever counts one, two, and three. One of the issues that comes up is that your client pled not guilty, and when Mr. Mank entered up a plea of not guilty, that's in the form of a general denial. And that puts that issue state of mind, absence of mistake, modus operandi, all those sorts of issues. And what evidence in particular came in on counts one, two, and three that would not have come in otherwise? Because it strikes me that most of what was coming in fits into either a common scheme or plan or a method of operation and at minimum shows an absence of mistake or intent. And so why is that not true and what particular evidence tainted the trying of these counts together? Judge, I would first note that counts one, two, and three were alleged to have occurred in November of 2013. And they related to essentially, and Mr. Cronk can correct me if I'm wrong, but Mr. Mink stealing a motor vehicle and attempting to run another vehicle off the road. The other counts relate to conduct that occurred in 2014 and then primarily in 2016, I believe, February of 2016. And they had nothing to do, the offenses charged at a later date were not similar in any way. And so in that sense, we're not part of a common scheme or plan. The only commonality would be, well, with respect to placing a pipe bomb in a motel would be the same victim is supposedly involved in both cases. Otherwise, obviously placing a pipe bomb in a motel has nothing in common really with trying to run somebody off the road. And as far as how Mr. Mink would be prejudiced, it would be simply if they had a question about, well, did he run, was he the person who tried to run another vehicle off the road in 2013? Or was he the person who put a pipe bomb in the motel in 2016, February of 2016? Then the fact that he's accused of doing both of those things could help convince the jury that yes, he was the one who committed the acts on both occasions. So that would be the argument why there is no common scheme or plan in how he was prejudiced by that. So if that answers the court's question. What I'm hearing generally is this. What you're arguing is that the counts are remote in time and the separation of time is a factor that we need to consider. Two, that the only commonality is that the victim is the same, that the actual crimes that were committed are disparate and kind in nature. And third, that the risk was that by trying all these crimes together, there's a chance that the individual counts were sort of meshed together in a sort of he's a bad man. And I'm sure he did it because of the taint from all of the other counts. And is that really a fair summary of your argument? It is, Your Honor. And while you were talking, I thought of one more thing, is that in connection with both sets, you know, the charges that relate to matters in 2013 and then the other counts, there was a lot of uncharged conduct that came in with respect to both sets of offenses. And so that also, I think, contributed to the prejudice. Those other uncharged conduct, for instance, there was evidence that Mr. Meek stuck a fork in the victim's ear. I think that was in connection with things that occurred in 2013 and presumably wouldn't have come in in connection with the other matters. So there was a whole raft of uncharged conduct that came in in connection with both sets of offenses that presumably wouldn't come in if those sets of offenses were separate. So I think what I'll turn to now is the other major component of the 600-month sentence was the tampering with witness and obstruction of official proceedings, which were accounts 14 and 15. There was a motion for summary judgment for those, and in order to be guilty of those offenses, there would have to be either an official proceeding pending, which I think everyone agrees there was not, or Mr. Meek's conduct would have to be connected with a specific official federal proceeding that was reasonably foreseeable to him. I'm not, from reading the government's brief, both in the statement of the case and then in the section relating to this offense, I didn't, and from reading the trial transcripts, I didn't see any basis for a finding that Mr. Meek contemplated or it was foreseeable that there was a specific federal proceeding that was contemplated. I think it was my characterization would be a more general fear that there might be some proceeding following, which is why he asked his father to break up a phone or fake committing another offense. I think those are the gist of what he was accused of doing, but there wasn't any indication that Mr. Meek should have foreseen that it was a specific federal proceeding underway. There was a Supreme Court case, Arthur Anderson, where the Supreme Court decided that, I think Arthur Anderson was an accounting firm that destroyed some records in advance of an imminent litigation hold or document hold, I guess it would be, and they found that, you know, those accountants, there was no evidence that they contemplated a particular proceeding. The same is true, I think, in Mr. Meek's case. Even if he did do the things alleged, there's an absence of evidence for the jury to find that he contemplated a specific federal proceeding. Is there a requirement that it be a specific federal proceeding, or is it sufficient that there are federal charges that may be impending and have some reason to understand that those charges are impending? Well, there doesn't have to be a specific federal proceeding pending, but the defendant does have to contemplate that it is a federal proceeding that could be instituted. In other words, just a general desire to hide evidence, say, without it being linked to, well, I want to hide evidence, well, I won't be prosecuted in federal court. I think that's what's absent in this case. So he may have been concerned that he could be charged with it somewhere, but there's no indication that he had any reason to think that it was a federal charge that he was looking at. I think he was interviewed by, well, he wasn't, but his father was interviewed initially by state and local authorities, and I don't think that there was any statement by them that, A, we're looking to prosecute your son in federal court. So there's just an absence of evidence from a defense perspective on that he had a reason to contemplate a federal charge or a federal proceeding. Therefore, those counts in the 241 should be set aside. I see that I'm close to the end of my time, so if I could reserve the rest for rebuttal, I would do so. Mr. Cronk. Good morning. May it please the court. I'm Cliff Cronk. I'm one of the prosecutors that pursued this case from the beginning with Special Agent Jason Pestman of the Bureau of Alcohol, Tobacco, and Firearms. There are a number of issues raised by Mr. Mink. I think some of them can be handled quickly. I want the court to feel free to ask me anything. I have a slight advantage over Mr. Meyer, given that he didn't try the case and he wasn't involved until after the jury rendered its verdict and Mr. Mink was sentenced. Having said that, though, we'll start with this official proceedings issue. We briefed that point, but I'll just reiterate. If we look at the tampering and destruction of evidence charges in the indictment, counts 14 and 15, and we look at it with the view that Mr. Meyer has given it, it would essentially eviscerate those crimes. If we can't show the defendant knew that there was likely to be a, in other words, that it's completely unforeseeable to him that a crime or a criminal investigation was underway. Here, the defendant was actually prosecuted in federal court in 2013 and was sentenced about a month before this bomb was found at the Quad City Inn. He was told that the ATF had been to his father's house and was asking questions about the bomb. Mr. Mink asked his father to destroy specific evidence in connection with that bomb. Mr. Mink clearly knew that the federal government was investigating him and he knew how the federal investigations worked. He had been an informant for the FBI and he had been prosecuted in federal court. He'd been indicted in federal court. He knew full well that there was going to be a federal investigation and that one had already commenced and that the way those go is you present matters to the grand jury. You have a trial and he clearly had the motive to destroy evidence that would subvert that official, those official proceedings. So we feel strongly that the evidence was sufficient to submit to the jury on the issue of foreseeability and would ask the court to deny relief to Mr. Mink on this basis. The defendant also focused in his brief on this means of identification issue and I want to talk about that for a minute. He focuses on the debit card as being the means of identification, but I'd ask the court to look at the indictment. The indictment identifies the name, social security number and date of birth as the means of identification. Clearly, those are means of identification that Mr. Mink used. He essentially admitted that Mr. Sheets was a real person and we know that he used Mr. Sheets' actual date of birth and social security number and he set up an account so that he could purchase items that would conceal his possession of a firearm as a felon. The statute and the indictment talk about committing identity theft in this situation in connection with other unlawful activity. In connection with his fairly broad language and clearly Mr. Mink took this man's means of identification in connection with his possession of a firearm and he was a convicted felon. There's no question about him being a convicted felon knowing he was a convicted felon and he admitted at trial that he knew he was prohibited from having a firearm. Mr. Mink raised the issue of joinder severance and the other evidence that was admitted at trial. This is a very complicated case. I think in a way Mr. Mink is shooting himself in the foot when he says there wasn't enough evidence to convict him even in light of all the evidence that he was guilty. In this case, all of the evidence overlaps and interrelates, especially forensic evidence. I want to remind the court that on the day after the bomb was discovered, Mr. Mink was traveling to Milan, Michigan to check into federal prison. From the hotel room in Milan, he sent an email tip to the city of Davenport admitting that he had set the bomb at the Quad City Inn or left the bomb there. He connected it to the Holy Family Cemetery bomb in his email. If we were not allowed to bring in that there was a Holy Family Cemetery bomb, we may have difficulty proving that Mr. Mink was associated with it. But by his own words, he was associated with it and of course all the forensic evidence that connected the firearm that was buried, the bomb at the Quad City Inn, and the bomb at the Holy Family Cemetery. I remind the court that the bomb at the Holy Family Cemetery was discovered just a short distance away from where the victim resided. It's quite clear that Mr. Mink, from the beginning in October of 2013, essentially started his efforts to harass, injure the alleged victim or the victim, Laura Leslie, and he did it repeatedly over time. We feel very strongly that all of this evidence would have been admitted in a joint, in a severed trial, simply because it showed motive and identification and lack of absence of mistake, intent. Almost every reason for a joint trial, as well as the fact that there was commonality in his efforts that he repeatedly meant to harass and injure the victim. He raised an issue with jury selection and the one juror who was familiar with the defense counsel, there's just simply no reason to strike the entire veneer based on an offhanded comment by a juror. And of course, all the jurors indicated they could be fair with Mr. Mink. I want to talk for a minute about this dangerous weapon idea and that Mr. Mink is claiming that to commit an offense that involves a deadly or dangerous weapon as a crime of violence, for instance, in this case, the allegation that he committed aggravated battery. And that he crossed the state line using a deadly weapon or a dangerous weapon, that you can't have both. You can't have the deadly weapon do double duty or punish him twice. That those are arguments made by Mr. Meyer. First of all, the defendant wasn't charged with aggravated battery ever involving the truck. He clearly was driving the truck when he rammed it into the vehicle that Ms. Leslie was a passenger. The fact that the truck could be a dangerous or deadly weapon, the jury wasn't instructed that he in fact used a deadly or dangerous weapon. The jury was given the identity of the weapon that is in a parenthetical. When the court instructed the jury on deadly weapon, it focused on the truck. That was the only item that could be considered a deadly or dangerous weapon. I'd ask the court to consider a sort of a different hypothetical. If felon in possession of a firearm was a crime of violence. And Mr. Mink committed felon in possession of a firearm when he got a gun in Iowa and went across the state lines to injure, harm, hurt a victim and use the same firearm. There'd be no double duty there for the firearm and there wouldn't be no double punishment for the firearm. The federal crime says that you may not use a dangerous weapon when you cross state lines to harm, injure, harass, annoy the victim and commit a crime of violence in so doing. We feel very strongly that there's absolutely no harm or no impediment to charging Mr. Mink with the enhancement for carrying or using a dangerous weapon. I asked the court to look at Mr. Meyer's argument that this Cunningham versus California case that he relies on has some precedential value. Looking at that case, he cites a sentence from that case that says that you may not use the same item for both a higher sentence and an enhancement. And the Supreme Court cited that in Cunningham because that's what the California statute says. Cunningham versus California is a Blakely Booker case that requires that the jury, not the judge, make the decision about sentence enhancements. There's no question that the jury here was given an instruction that required that they determine whether a dangerous weapon was used. And they checked the box saying that they unanimously agreed that Mr. Mink used a dangerous weapon in a motor vehicle. Excuse me. I just have one question about the instructions. You know, when we look at dangerous weapon as used in this particular count, it is not an element, but instead it is a sentencing enhancement. It's a factor because it does increase the length of sentence needed to be submitted to the jury, which is exactly what the judge did. And I don't think anyone can quibble with that. One issue that did kind of catch my eye is when you look at the dangerous weapon definition instruction, it actually relates back to counts 3 and 10, where dangerous weapon is actually an element. And it doesn't say anything about dangerous weapon. The definition is the same. I mean, it doesn't really matter. But, you know, it could have said, as used in these instructions, a dangerous weapon is blah, blah, blah, blah, blah. But instead it had element directors. And it doesn't then relate back to the enhancement here by its plain language. I think you can read it as a whole and say, well, a dangerous weapon is a dangerous weapon. But Mr. Meyer's argument is quite subtle here. He is arguing that when you have the parenthetical, it tends to be a director in this context rather than just an exemplar, right? For example, the automobile could be a dangerous weapon. That's a question for you as the jury. But the way that it's constructed and when you read it in conjunction with the dangerous weapon definition, it might be something different. I know you don't agree with that. Tell me why you don't. Well, let's start with the jury being advised of what the charges are. And they're told what Mr. Mink is indicted for. And in the indictment, it specifically lays out each offense, including all of the elements. And in count two, it includes that the offense was committed with a dangerous weapon. Count three does have. So that's my first point. The jury was provided the indictment, the language of the indictment. They know what he's charged with. Second of all, in the preliminary instructions, the jury is told these are the things that you look at. I think that probably for me, the thing that Mr. Meyer has helped me with in the many, many years I've been a prosecutor is understanding really that the jury, all juries are trying to do exactly what the judge told them to do. And they're following the judge's instructions to the best of their ability. But if they have questions, they present them to the court and say, we're confused about this. We don't understand this. And there's really no reason to believe the jury was somehow confused or didn't understand that Mr. Mink was being charged with this domestic violence charge and the stalking charge. In counts two and three. And then in each of those, he's alleged to have used a vehicle, a motor vehicle as a dangerous weapon. There's no other weapon identified during the trial. So when you put all those things together, I think you don't get to a point where the jury just was too confused, didn't understand, didn't follow the law. And in this case, I think it's quite clear that they did follow the law and they did not have confusion about the elements or the use of a dangerous weapon. I'm not sure if there's anything else I can help the court with. I do think when you consider all of these instructions as a whole, when you consider the nature of the evidence here and its overlapping nature, when you consider the instructions, the lack of any jury issues with respect to this, the fact that almost all of this was not raised at trial and had it been, we clearly would have been able to correct or elucidate matters that were raised. Unfortunately, we didn't have that opportunity in every instance. But I think in the end, we got a fair verdict based on the law, on the evidence. And we're asking the court to affirm. If there's no other questions, I'll yield the rest of my time. Thank you very much. OK, Mr. Meyer, you have three minutes and 47 seconds. Thank you. Mr. Kroc mentioned the means of identification issue. In that, it does appear that the evidence is that Mr. Sheets, S-C-H-E-E-T-Z, to obtain a debit card and then funded the debit card out of his own account and the account was linked to Mr. Mink's own account. So then this debit card was used by Mr. Mink or somebody else to obtain a barrel of a gun, I think is the allegation. Without mentioning Mr. Sheets, Mr. Sheets' name or information didn't come up whatsoever in connection with that actual purchase. I think the debit card doesn't have a name on it. And so that Mr. Sheets' means of identification wasn't, was just incidental to the purchase of that gun barrel, if that's what it was, I think it was. Well, it may be just incidental, but it also may be evidence of an intent to evade being identified as a person prohibited from possessing firearms or constituent parts thereof. And that isn't that a jury question at that point? Are you following what I'm saying? You know, he uses the identity of a real live human being. The debit card can be traced back to that individual eventually in the event that there's an investigation. He uses that in theory to avoid any tracing of the purchase of a component part of a firearm back to him. But it traces back then to Mr. Sheets. I mean, that's the argument, the allegation, isn't it? I may have this incorrect, but my understanding is that the debit card account is linked to Mr. Mink's address and bank account. So it would be. I think that's how the government. That's not right. Mr. In order to obtain the card, a person had to use Mr. Sheets' identification. But after that, any use of the card would link it to Mr. Mink, not to Mr. Sheets. But if I've got the facts wrong, I'll stay incorrect. But that's my understanding. I could yield to Mr. Cronk to fill us in on this. He'll have some time, I guess, as well. The other thing I wanted to mention is that in connection with knowledge, the knowledge element was not included in. The government didn't have to prove knowledge in connection with any of the 924 related offenses, which I think this court is moving towards changing instructions and requiring that in 924C and other firearm and explosive cases. So thank you very much. OK. Thank you very much, counsel. Case has been well argued and it is submitted and the court will render a decision in due course and counsel may stand aside. And Madam Clerk, would you.